United States District Court
Southern District of Texas
**ENTERED**
April 09, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| WILLIE CHURCH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:23-CV-00074 |
| | § | |
| ROMEO RANGEL, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION TO GRANT
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Willie Church, appearing *pro se* and *in forma pauperis*, has filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. Pending is Defendants' Motion for Summary Judgment.  (D.E. 38).  For the reasons set forth below, the undersigned RECOMMENDS Defendants' Motion for Summary Judgment (D.E. 38) be **GRANTED** and this case be **DISMISSED**.

## I.       JURISDICTION

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This case has been referred to the undersigned magistrate judge for case management and making recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

## II.      PROCEDURAL BACKGROUND

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID) and is housed at the William Clements Unit in Amarillo,

Texas.  Plaintiff's allegations in this case arise in connection with his previous housing assignment at the McConnell Unit in Beeville, Texas.

Plaintiff filed this action on March 15, 2023, in the San Antonio Division of the United States District Court for the Western District of Texas.  (D.E. 1).  On March 17, 2023, the case was transferred to this Court because the facts of the case occurred at the McConnell Unit which is in the Southern District of Texas. On April 25, 2023, the undersigned conducted a *Spears*[1] hearing where Plaintiff was given an opportunity to explain his claims.  On April 27, 2023, the undersigned entered a screening Memorandum and Recommendation ("M&R") in accordance with the Prison Litigation Reform Act. (D.E. 17). *See* 42 U.S.C. § 1997e(c); 28 U.S.C. §§1915(e)(2), 1915A.

In the screening M&R, the undersigned made the following recommendations: (1) Plaintiff stated deliberate indifference claims against Lt. Aaron Cavazos, Officer Romeo Rangel and Officer Sven Strack in their individual capacities for monetary damages; (2) Plaintiff stated an excessive force claim against Officer Aaron Cavazos in his individual capacity for monetary damages; (3)  Plaintiff's claims for money damages against the defendants in their official capacities be dismissed as barred by the Eleventh Amendment; and (4) Plaintiff's remaining claims be dismissed without prejudice.  United States District Judge Nelva Gonzales Ramos adopted the screening M&R on June 1, 2023.[2]

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

[2] Judge Ramos's order clarifies that Plaintiff's claims against the defendants in their official capacities for monetary damages were dismissed without prejudice. (D.E. 21, p. 2, n.1).

The undersigned ordered service and Defendants filed an Answer on June 12, 2023. (D.E. 18, D.E. 27). A scheduling order was entered on June 12, 2023.  (D.E. 29). On November 12, 2023, Defendants filed the instant motion for summary judgment and summary judgment exhibits.  (D.E. 38, D.E. 39). On January 8, 2024, the Court received a letter from Plaintiff which the undersigned construes and has been docketed as Plaintiff's Response in Opposition to Defendants' Motion For Summary Judgment.  (D.E. 44).  After having read the parties' briefing and evidence, the undersigned determined that the use of force incident had been recorded on video but was not included as an exhibit by either party.  Therefore, on March 14, 2024, the undersigned ordered counsel for the defendants to submit to the Court the use of video.  (D.E. 45).  The Court received the video on March 27, 2024. (D.E. 47-1).

## III.   SUMMARY JUDGMENT EVIDENCE

Defendants have submitted the following summary judgment evidence:

Exhibit A:   Plaintiff's TDCJ Grievance Records (D.E. 39; D.E. 39-1 – D.E. 39-18);

Exhibit B:   Office of Inspector General Investigation (D.E. 38-1 – D.E. 38-5);

Exhibit C:   Emergency Action Center System Incident Report (D.E. 38-6);

Exhibit D:   Plaintiff's TDCJ Medical Records (D.E. 39-19 – D.E. 39-24).

Plaintiff's verified complaint, including attached exhibits (D.E. 1), serves as competent summary judgment evidence based on his representation "under penalty of

perjury" that his statements made in his complaint and attachments were "true and correct." *See Garrett v. Davis*, No. 2:13-CV-70, 2017 WL 1044969, at *3 (S.D. Tex. Mar. 20, 2017). Attached to Plaintiff's Complaint is a Step 2 Grievance Form. (D.E. 1, pp. 6-7). Additionally, Plaintiff's *Spears* hearing testimony may serve as competent summary judgment evidence. *Id.* (citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003); *Grimon v. Collins*, 30 F.3d 1491 (5th Cir. 1994) (concluding that Spears testimony given under the penalty of perjury is competent summary judgment evidence)). The undersigned has watched and considered the video in making this recommendation. The use of force video is currently on file with the United States District Clerk. (D.E. 47-1).

The parties' version of events leading up to the use of force contained in the summary judgment evidence do not differ in any material way. To the extent there are relevant disagreements with the summary judgment evidence, the undersigned will so note.

On about June 20, 2021, Plaintiff was an inmate at the TDCJ McConnell Unit in Beeville, Texas. (D.E. 1). Plaintiff was charged in a disciplinary case with assaulting a TDCJ staff member.[3] (D.E. 38-1, p. 9). After the incident, Plaintiff was removed from the general inmate population and placed on Constant Direct Observation ("CDO"),

---

[3] Plaintiff denies assaulting an officer. Plaintiff was convicted at a disciplinary proceeding for assaulting an officer and was assessed 60 days loss of good time and other administrative discipline and temporary loss of privileges. The allegations of Plaintiff assaulting an officer were investigated by the TDCJ Office of Inspector General (OIG) and it appears the allegations of Plaintiff assaulting an officer were not substantiated. (D.E. 38-1 pp. 8, 16). Whether the TDCJ disciplinary conviction and punishment were reversed is not clear. However, the facts relating to the alleged assault on an officer charge are not essential to the instant action because the use of force was not in response to Plaintiff's alleged assault on an officer. The use of force involving OC spray against Plaintiff occurred at a different location within the McConnell Unit after the alleged assault and it involved different officers.

sometimes referred to as "suicide watch," because of statements he made.  (D.E. 38-4, p. 5).  The CDO occurred in 12 Building of the TDCJ McConnell Unit.  (D.E. 38-2, p. 7).

After being placed in CDO, Lt. Cavazos directed Plaintiff to remove his clothes for a strip search.[4]  (D.E. 38-2, p. 7).  Plaintiff refused to removed his clothes.  (D.E. 38-1, pp. 10-11).  Lt. Strack arrived at the scene and also directed Plaintiff to remove his clothes for a strip search.  (D.E. 38-4, p. 5).  Plaintiff continued to refuse to disrobe.  (D.E. 38-4, p. 5).  Lt. Strack then left the scene.  (D.E. 38-4, p. 5).  At some point Plaintiff turned his back to Lt. Cavazos.  (D.E. 19, p. 10).  Lt. Cavazos repeated the order to undress to Plaintiff several times.  Lt. Cavazos then initiated use of force protocols, requested a camera to record the incident and requested permission to deploy a chemical agent[5] against Plaintiff.  (D.E. 38-4, p. 5).  Assistant Warden Gene Miller authorized Lt. Cavazos to use a chemical agent.  (D.E. 38-4, p. 5).  Lt. Cavazos deployed a chemical agent against Plaintiff three times.  After each deployment, Plaintiff was instructed to undress.  Plaintiff admits he was given several orders to submit to a strip search and he refused to obey the orders.  (D.E. 38-1, p. 11).  Plaintiff continued to be non-compliant until the third deployment of the chemical agent.  (D.E. 38-4, p. 5).  After the third deployment of the chemical agent, Plaintiff removed his clothes and was compliant.  (D.E. 38-4, p. 5).  Plaintiff believes Lt. Cavazos

---

[4] Plaintiff testified at the *Spears* hearing he should have been given a "suicide gown" but Lt. Cavazos told him "you don't get shit."  (D.E. 19, p. 10).

[5] Plaintiff refers to the substance as gas or "OC" spray.  Counsel for the Defendants and their evidence refer to the substance as a chemical agent. Neither side provides a description of the substance.  Nevertheless, the Court accepts Plaintiff's description of "OC" gas which is the common term for Orthochlorbenzalmalononitrile which TDCJ describes as "a natural substance made from the oil and resins of peppers" *See* https://tdcj.texas.gov/divisions/rpd/post_sec_ed/08_session_three_01.html.   OC spray is sometime commonly referred to as tear gas.

deployed the chemical agent four times.  (D.E. 19, p. 11).  Licensed Vocational Nurse Jennifer Matus arrived at the scene, evaluated Plaintiff and cleared Plaintiff to be released back to security.  (D.E. 38-4, p. 5).  Lt. Cavazos explained the decontamination procedures to Plaintiff which consist of air, soap and water, after which the use of force video was terminated.  (D.E. 38-4, p. 5).

This case presents the issue of whether the use of force against Plaintiff was excessive or was reasonable and necessary. Plaintiff admits he was non-compliant with the officer's instructions.  However, Plaintiff alleges the use of force was excessive in that it was greater than necessary.  Plaintiff describes Lt. Cavazos' use of force as "he sprayed me real bad like four times"  (D.E. 19, p. 7), "it was like completely too much" (D.E. 19, p. 8), "he just started let[ting] loose" (D.E. 19, p. 10) and "he was going crazy with the gas." (D.E. 19, p. 11).  Plaintiff testified that on prior occasions TDCJ officials had to deploy chemical agents against Plaintiff but "it had never been like that." (D.E. 19, p. 15). Lt. Cavazos describes the use of force in a more controlled and reasonable manner with Plaintiff being giving additional warnings and opportunities to comply before each use of the chemical agent.  (D.E. 38-4, p. 5).  The use of force video provides the clear and undisputed evidence of the use of force incident in this case.

### Use of Force Video

The use of force video begins with a view of Plaintiff being detained in a small holding cage[6] that is located in an institutional hallway.  (D.E. 47-1).  Plaintiff is wearing

---

[6] This phone booth sized cage appears to be what TDCJ officials refer to as Constant Direct Observation ("CDO").

his white TDCJ issued pants; he is shirtless and is holding his shirt in his hands.  (D.E. 47-1 at 00:00).  The holding cage has a length and width of about 3x3 feet and a height of approximately seven feet.  The cage is about the size of a large telephone booth.  The top half of the cage is wire mesh or grating and is open to the air.  The bottom half is solid metal.  There is a food slot in the front middle portion of the cage.  Initially, Plaintiff is seated.  He is not wearing hand restraints.  Lt. Cavazos identifies himself and states the time is 16:58 (4:58 p.m.) and that the date is June 20.  Plaintiff stands up inside the cell and is visibly agitated.  Other officers are identified as being present.[7]  (D.E. 47-1 at 00:00-00:30).

Lt. Cavazos orders Plaintiff to comply with officer instructions and warns him that a chemical agent will be deployed if he fails to do so.  Plaintiff covers his face with his shirt and turns his back to Lt. Cavazos.  Lt. Cavazos does not make any movement or gesture to indicate the use of the chemical agent is imminent.  The chemical agent has not yet been deployed at this point of the video.  Lt. Cavazos departs the field of view of the recording (D.E. 47-1 at 1:00 – 1:15).  Lt. Cavazos approaches the holding cage again and directs Plaintiff to follow instructions and states force will be used if he fails to follow instructions.  Plaintiff continues to cover his face with his shirt and turns his back to Lt. Cavazos.  (D.E. 47-1 at 1:30-1:41).  Lt. Cavazos deploys the chemical agent for the first time from a distance of approximately one to two feet from the cage for approximately

---

[7] The quality of the audio is not very good, in part because Officer Cavazos who is doing most of the talking is wearing a protective mask. While not entirely clear, it sounds like the officers who were identified as being present include Sergeant Cesar Cardenas, Officer Gamez, Lt. Cavazos, and Officer Pena.

three seconds while Plaintiff is turned away from Lt. Cavazos.  The chemical agent is an aerosol that is projected like a spray fog.  Lt. Cavazos is wearing a protective mask during these encounters.  (D.E. 47-1 at 1:42-145).  Plaintiff removes the shirt from his face and remains standing.  Other than a few coughs, Plaintiff does not appear to be in distress.  He remains non-compliant.  (D.E. 47-1 at 1:45-2:25).  Plaintiff can be heard saying, "Don't gas me again" in a tone and manner that is directive, as opposed to a pleading manner. (D.E. 47-1 at 2:25). Lt. Cavazos approaches Plaintiff again and orders Plaintiff to comply with his instructions.  Plaintiff continues to be non-compliant by again turning his back to Lt. Cavazos, covering his face with his shirt and not following instructions.  (D.E. 47-1 at 3:16 – 3:44).  Lt. Cavazos deploys the chemical agent a second time for approximately three seconds in a similar manner as the first deployment.  (D.E. 47-1 at 3:45 – 3:48). Plaintiff remains standing, coughs sporadically and wipes his eyes.  (D.E. 47-1 at 3:48 – 4:33). Plaintiff can be heard telling Lt. Cavazos three times in a matter of fact way, "that's twice," referring to the use of the chemical agent.  (D.E. 47-1 at 4:37).  After several minutes, Lt. Cavazos approaches Plaintiff a third time and asks Plaintiff, "Are you going to comply with procedures?"  Lt. Cavazos is not holding the chemical agent canister at this time.  Plaintiff turns away from Lt. Cavazos and does not answer the questions. No chemical agent is deployed during this interaction. (D.E. 47-1 at 7:36 - 7:44).  After approximately a minute and a half, Plaintiff asks several times if he is going to be sprayed again.  (D.E. 47-1 at 9:15).  Lt. Cavazos approaches Plaintiff and instructs him to comply with instructions.  (D.E. 47-1 at 9:27).  Lt. Cavazos then directs another officer to open the

food slot to the cage.  It appears the officers intended to direct Plaintiff to remove his clothes and put them through the slot.  However, Plaintiff again turns his back, covers his face and does not comply with Lt. Cavazos' instructions.  (D.E. 47-1 at 9:39 – 9:55).  Lt. Cavazos closes the food slot and departs from the field of view of the video.  The chemical agent was not deployed during this interaction.  (D.E. 47-1 at 9:55 – 10:04).  Lt. Cavazos reappears and directs plaintiff to comply with his instructions.  Plaintiff continues to be noncompliant and again turns his back to Lt. Cavazos and covers his face.  (D.E. 47-1 at 10:04 – 10:21).  Lt. Cavazos deploys the chemical agent the third and final time for a duration of approximately five seconds from a distance of three to four feet from the cage. (D.E. 47-1 at 10:25-10:30).  After about thirty seconds, Lt. Cavazos approached Plaintiff and asks Plaintiff several times if he is going to comply.  Plaintiff continued to refuse to follow instructions.  (D.E. 47-1 at 10:58 – 11:13). Lt. Cavazos can be heard talking into the camera and appears to be requesting an extraction team to deal with Plaintiff.  (D.E. 47-1 at 11:28).

Lt. Cavazos can be heard identifying the time as being 18:09.  (D.E. 47-1 at 11:39). For several minutes, Plaintiff remains standing and rubbing his eyes.  It is apparent the gas has irritated Plaintiff's eyes.  After a few minutes, Plaintiff volunteers that he will follow instructions.  (D.E. 47-1 at 11:40 - 13:15).  Correctional officers approach the cage, open the food slot and give Plaintiff directions to disrobe and put his clothes through the slot. Plaintiff follows instructions. Plaintiff's clothes are inspected and Plaintiff is visually inspected for contraband.  The strip search of Plaintiff is a visual search and is non-

9 / 35

invasive. (D.E. 47-1 at 13:44 – 15:11).  Neither Lt. Cavazos nor any of the other officers were verbally or physically abusive to Plaintiff during the course of the video.

The facts occurring after the deployment of the chemical agent against Plaintiff are relevant to the instant motion with regard to Plaintiff's deliberate indifference claim.  In the screening M&R, the Court determined Plaintiff stated deliberate indifference claims against Officer Aaron Cavazos, Officer Romeo Rangel and Officer Sven Strack in their individual capacities for monetary damages.  Plaintiff testified at the *Spears* hearing he had an adverse reaction to the chemical agent causing Plaintiff to urinate and defecate on himself and that he lost consciousness. (D.E. 19, pp. 8-9).  Plaintiff alleges he was left unattended for two to three hours.  (D.E. 19, p. 8).  Plaintiff alleges Lt. Cavazos, Lt. Rangel, and Lt. Strack were aware the chemical agent was used against him, that he had an adverse reaction, and they failed to take any action to assist him for approximately two to three hours.  Plaintiff testified that after this delay, Lt. Strack took Plaintiff to a shower where Plaintiff was allowed to rinse.  (D.E. 19, p. 12, 17).  Finally, Plaintiff testified the chemical agent has caused him to have continued vision problems, and his vision has not returned to normal.  Additionally, Plaintiff alleges he has suffered emotional trauma as a result of the incident. (D.E. 19, p. 18).

The use of force video shows it began at 16:48 (4:48 p.m.) on June 20, 2021.  (D.E. 47-1 at 00:18). The video further shows that a nurse practitioner visually examined Plaintiff after the use of force at about 15 minutes into the video, which corresponds to a time of approximately 5:00 p.m. This interaction between Plaintiff and the nurse is recorded on the

video and took less than 30 seconds.  During this interaction, the nurse did not take any of Plaintiff's vital signs or conduct a thorough examination.  However, the nurse practitioner declared Plaintiff medically cleared.  (D.E. 47-1 at 15:10 – 15:30).  Lt. Cavazos then gives Plaintiff remediation instructions which involve using air, soap, and water.  (D.E. 47-1 at 16:36).  The video ends at approximately the seventeenth minute.  (D.E. 47-1 at 16:55).  Plaintiff is not seen vomiting, urinating or defecating himself during the course of the video.

### Plaintiff's TDCJ Medical Records

Plaintiff's TDCJ medical records show that Plaintiff was seen by a licensed vocational nurse at 6:19 p.m. on June 20, 2021. (D.E. 39-22, p. 137).  This medical assessment occurred one hour and twenty-four minutes after the end of the use of force video.  During this assessment, medical personnel took Plaintiff's height, weight, BMI, oxygen saturation level, blood pressure, pulse, and rate of respiration.  (D.E. 39-22, p. 135). This examination appears to have been for psychiatric symptoms, but Plaintiff refused to answer questions which resulted in him being referred to crisis management.  (D.E. 39-22, pp. 141-142).  The activity notes indicate Plaintiff was alert, tense, dressed appropriately, and oriented to person, place, time and situation.  Plaintiff was also described as withdrawn and having organized thought processes with normal speech and motor activity.  His eye contact was described as poor.  (D.E. 39-22, pp. 139 – 140).

Plaintiff's TDCJ medical records also indicate that at 6:52 p.m. on June 20, 2021, Plaintiff was again seen at the medical department although by a different vocational nurse.

(D.E. 39-22, p. 136).  While the 6:19 p.m. examination was to assess Plaintiff's psychiatric condition, the 6:52 p.m. assessment related to Plaintiff's physical condition after the use of the chemical agent.  (D.E. 39-22, p. 136).  The medical records reflect Plaintiff denied any injuries or respiratory difficulty.  (D.E. 39-22, p. 136).  Plaintiff was assessed as having no adverse health effects from the use of force and he was released back to security. (D.E. 39-22, p. 136).

Plaintiff's medical records also indicate Plaintiff was seen by the medical department on June 28, 2021.  During this assessment by a licensed vocational nurse, Plaintiff denied any injuries or respiratory distress. (D.E. 39-22, p. 135).  Plaintiff was again assessed as having no adverse health effects from the use of force.  Plaintiff was released back to security. (D.E. 39-22, p. 135).

Plaintiff's TDCJ medical records immediately following the incident do not contain any reference to Plaintiff complaining about injuries to his eyes.  However, Plaintiff's medical records do indicate that he later complained of having burning eyes and blurry vision.  Plaintiff's records indicate he was seen at a Specialty Clinic for an eye exam on July 22, 2021 and September 15, 2021.  (D.E. 39-22, p. 192).  Plaintiff also reported that "I had glasses before but I haven't had them now in a long time."  (D.E. 39-22, p. 192).  Plaintiff was seen again on January 24, 2022 where he complained that his photosensitivity was worsening.  (D.E. 39-22, p. 189).

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion.  *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).  The Court may not weigh the evidence or evaluate the credibility of witnesses.  *Id.*  Furthermore, affidavits or declarations "must be made on personal knowledge, [shall] set out facts that would be admissible in evidence, and [shall] show that the affiant or declarant is competent to testify to the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

There is an additional wrinkle to consider on summary judgment when video evidence is available. *See Pinder v. Skero*, 375 F.Supp.3d 725, 735 (S.D. Tex. 2019). When one party's version of the facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Although courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016).

## V.     DISCUSSION

### A.     Defendants' Motion For Summary Judgment

Defendants Cavazos, Rangel, and Strack each move for summary judgment because Plaintiff failed to properly exhaust his administrative remedies before filing suit.  (D.E. 38). Defendants additionally argue they are entitled to judgment as a matter of law because the undisputed summary judgment evidence establishes Plaintiff was not subjected to excessive force or deliberate indifference.  Defendants further argue they are entitled to qualified immunity.  (D.E. 38).

### B.     Exhaustion

#### 1.     General Legal Principles on Exhaustion

The Prison Litigation Reform Act, 42 U.S.C. § 1997e, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents.  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002).  Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process.  *Booth v. Churner*, 532 U.S. 731, 734 (2001); *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).  A prisoner must complete the

administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 83 (2006).

The TDCJ provides a two-step procedure for presenting administrative grievances. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam).  Step 1 requires the inmate to present an administrative grievance at his unit within fifteen days from the date of the complained-of incident.  *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).  The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has fifteen days to appeal by filing a Step 2 grievance, which is handled at the state level.  *Id.*  The Fifth Circuit requires that both steps be completed in order to file suit in federal court.  *Id* at 515-16 ("[A] prisoner must pursue a grievance through both steps for it to be considered exhausted.")  *See also Dillon v. Rogers,* 596 F.3d 260, 268 (5th Cir. 2010) ("under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion; instead, we have required prisoners to exhaust available remedies properly.")

### 2.  Summary Judgment Evidence and Analysis on the Issue of Exhaustion

Defendants have submitted as Exhibit A to their Motion For Summary Judgment, Plaintiff's entire TDCJ grievance file for the time period January 1, 2021 to December 1, 2022.  (D.E. 39, p. 2; D.E. 39-1 to 39-18). The summary judgment evidence establishes Plaintiff did not file a Step 1 grievance raising the issue of excessive force or deliberate indifference complaint in connection with the June 20, 2021 incident where Plaintiff was subject to the deployment of a chemical agent. (D.E. 39, p. 2; D.E. 39-1 through 39-18).

The only mention in Plaintiff's grievance records of the June 20, 2021 incident is in a Step 1 grievance signed by Plaintiff on August 3, 2021 (D.E. 39-13, pp. 8-9) and in a Step 2 grievance signed by Plaintiff on January 24, 2022.  (D.E. 39-13, pp. 6-7).  In the Step 1 grievance, Plaintiff complains generally about staff retaliation in connection with Plaintiff writing letters and complaining to the TDCJ Ombudsman.  Plaintiff only generally references "an event that took place on J-2 section on 6-20-21." (D.E. 39-13, p. 8).  Plaintiff wrote this grievance from the TDCJ Jester 4 Unit, in Fort Bend County, Texas.  In this grievance, Plaintiff asked that he not be sent back to the McConnell Unit.  This grievance does not seek resolution of either Plaintiff's allegations regarding excessive force or deliberate indifference arising out of the June 20, 2021 use of force incident.  (D.E. 39-13, p. 9).  In the Step 1 grievance, Plaintiff did not provide any facts relating to the June 20, 2021 use of force incident and he did not seek resolution of anything that occurred on that date. In the Step 1 grievance response, Plaintiff was told that there was no evidence Plaintiff was subjected to retaliation or staff violating policy.   (D.E. 39-13, p. 9).

In Plaintiff's Step 2 grievance, Plaintiff complained for the first time that he was left in a holding cage without decontamination for an unreasonably long period of time. (D.E. 39-13, p. 6).  Plaintiff did not complain about being subjected to excessive force. (D.E. 39-13, p. 6). The Step 2 grievance response advised Plaintiff his grievance in Step 1 was addressed and that "only one issue will be addressed per grievance."  (D.E. 39-13, p. 7). Plaintiff was further advised he could file an additional grievance if necessary.  Plaintiff filed no further grievances related to the June 20, 2021 incident.

In Plaintiff's response to the Defendant's Motion For Summary Judgment, Plaintiff states that he filed a grievance within 15 days of the incident by writing the TDCJ Ombudsman and that his letter resulted in an investigation. (D.E. 44). Plaintiff further argues his letters to the Ombudsman explained in detail what the Defendants did to him. (D.E. 44). Plaintiff also claims he sent letters to the Bee County District Attorney. Plaintiff claims he grieved to the best of his ability, but he does not contest Defendants' evidence that he failed to utilize the TDCJ two-step grievance procedure. (D.E. 44).

In *Johnson v. Ford*, 261 F. App'x 752 (5th Cir. 2008), the Court explained that it has taken "a strict approach" regarding the exhaustion requirement. *Id.* at 755 (citations omitted). The Fifth Circuit held that the applicable rules must be followed and that the inmate had not satisfied the exhaustion requirement where a grievance was returned unprocessed for failing to follow the applicable rules. *Id.* at 756–57 (citing *Woodford*, 548 U.S. at88). The Fifth Circuit rejected the inmate's excuse that he had utilized alternative methods to satisfy the exhaustion requirement. *Id.* at 756.

Defendants' motion for summary judgment should be granted because Plaintiff failed to exhaust his administrative remedies. Plaintiff failed to file any grievance, Step 1 or Step 2, that references his claim that he was subjected to excessive use of force. Plaintiff only references the deliberate indifference complaint in his Step 2 grievance. Grievances raised for the first time in a Step 2 grievance are considered unexhausted. *Randle v. Woods*, 299 F. App'x 466, 467 (5th Cir. 2008). Additionally, Plaintiff's Step 1 grievance was signed by Plaintiff on August 3, 2021, well after the 14-day filing deadline. Plaintiff simply

has not utilized the TDCJ procedures to attempt to resolve his grievances before filing this action. *See Patterson v. Stanley*, 547 F. App'x 510, 511 (5th Cir. 2013) (explaining that the primary purpose of a grievance is to give prison officials fair opportunity to address the problem that will later form the basis of the lawsuit). "[D]istrict courts have no discretion to excuse a prisoner's failure to properly exhaust the prison grievance process before filing their complaint." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012) (per curiam).

Therefore, the undersigned respectfully recommends Defendants' Motion For Summary Judgment be **GRANTED** and all of Plaintiff's remaining claims be dismissed for failure to exhaust his administrative remedies.

### C.   Excessive Force[8]

#### 1.   General Legal Principles for Excessive Force Claims

Convicted inmates have a constitutional right under the Eighth Amendment to be free from the use of excessive force. *See Whitley v. Albers*, 475 U.S. 312, 319-21 (1086); *Anthony v. Martinez,* 185 F. App'x 360, 363 (5th Cir. 2006). However, not "every malevolent touch by a prison guard" rises to the level of an Eighth Amendment violation. *Hudson v. McMillian*, 503 U.S. 1, 9 (1993).

In considering excessive force claims, the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6-7. The Supreme Court in *Hudson* has articulated the following relevant factors to consider when evaluating whether a use of force was

---

[8] This M&R addresses Plaintiff's excessive force and deliberate indifference claims in the event the Court does not adopt the undersigned's recommendation that Plaintiff failed to exhaust his administrative remedies.

excessive: (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any effort made to temper the severity of a forceful response. *See id.* at 7; *See also Cowart v. Erwin*, 837 F.3d 444, 452 (5th Cir. 2016) (reciting the "well-known *Hudson* factors.")

While the "core judicial inquiry" in an Eighth Amendment excessive force allegation is the nature of the force used, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7). A "significant injury" is not a threshold requirement for establishing an excessive-force claim. *Wilkins*, 559 U.S. 37–8; *Hudson*, 503 U.S. at 7. Thus, "the *Hudson* factors do not affect 'the rule that requires proof of injury, albeit significant or insignificant." *Scott v. TDCJ Director*, No. 6:21-CV-00172, 2022 WL 822130, at *5 (E.D. Tex. Feb. 2, 2022), *rec. adopted* 2022 WL 822019 (E.D. Tex. Mar. 17, 2022) (citing *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

### 2.    Qualified Immunity

Defendants contend in their summary judgment motion they are entitled to qualified immunity with respect to Plaintiff's excessive force claims. (D.E. 28, pp. 6-7). Government officials performing discretionary duties can respond to § 1983 claims by asserting qualified immunity. *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (citing *Haverda v. Hays Cty.*, 723 F.3d 586, 598 (5th Cir. 2013)).

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). Government officials are given "breathing room to make reasonable but mistaken judgments" and "all but the plainly incompetent or those who knowingly violate the law" are protected. *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (citations omitted). Qualified immunity "represents the norm, and courts should deny a defendant immunity only in rare circumstances." *Rich*, 920 F.3d at 294; *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (Courts "must think twice before denying qualified immunity.")

The usual summary judgment burden of proof is altered in the case of qualified immunity defense. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). When a government official has pled the defense of qualified immunity alleging the actions taken were in good faith and within the scope of discretionary authority, the burden is on the plaintiff to establish the official's conduct violated clearly established law. *Id*. Plaintiffs cannot rest on pleadings but instead must show a genuine issue of material fact concerning the reasonableness of the official's conduct. *Id*.; *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489-90 (5th Cir. 2001).

To survive summary judgment on the issue of qualified immunity, a plaintiff must satisfy two independent inquiries. First, whether viewing the summary judgment evidence in the light most favorable to Plaintiff, the defendants violated the alleged victim's constitutional rights. *Freeman v. Gore,* 483 F.3d 404, 410 (5th Cir. 2007); *Delaughter v.*

*Woodall*, 909 F.3d 130, 137-38 (5th Cir. 2018).  If the Court determines "that the alleged conduct did not violate a constitutional right, [the] inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity." *Lytle v. Bexar Cnty., Tex.,* 560 F.3d 404, 410 (5th Cir. 2009) (citation omitted).

If there is a genuine dispute of material fact regarding whether there was a constitutional rights violation, the Court then asks whether defendants' actions were objectively unreasonable in light of the clearly established law at the time of the constitutional violation.  *Freeman,* 483 F.3d at 411; *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004) (The second prong requires courts to "ask whether the right was clearly established—that is, whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'") (citation omitted).

If the Court answers both questions in the affirmative, the government official is not entitled to qualified immunity.  *Lytle,* 560 F.3d at 410.  Courts are permitted to exercise discretion in determining the order in which to analyze the two-part qualified immunity test.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (citations omitted).  At this stage, a court's qualified immunity inquiry requires a court "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty*, 391 F.3d at 655; *Tolan v. Cotton*, 572 U.S. 650, 651, 657-59 (2014).

### 3.      Analysis – Excessive Force

In applying the *Hudson* factors, the undersigned relies heavily on the use of force video. *See Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (noting the importance of video evidence at the summary judgment stage of a case).  Regarding the injury suffered by Plaintiff, Plaintiff suffered eye and skin irritation, coughing and temporary respiratory distress.  Plaintiff also testified he has endured long term vision problems relating to having blurry vision, although Plaintiff has not submitted any competent summary judgment evidence as to this fact or whether his vision problems were caused by the use of force which occurred on June 20, 2021.  Nevertheless, for purposes of this M&R, the undersigned considers the evidence on this matter disputed and views it in the light most favorable to Plaintiff.  Therefore, the undersigned considers Plaintiff to have suffered more than a *de minimis* injury.

With regard to the second *Hudson* factor, a legitimate need for application of force existed.  Plaintiff made comments about self-harm and suicide and he continuously refused to follow directives from correctional officers.  Plaintiff did not respond to Lt. Cavazos' instructions and Plaintiff refused to submit to a visual search of his person.  Plaintiff turned his back to Lt. Cavazos and he covered his face with his shirt.  An inmate's refusal to follow orders, when accompanied by resistance, justifies the reasonable application of force. *See Dillon v. Moore*, No. H-17-0204, 2018 WL 2317700, at *5 (S.D. Tex. May 22, 2018) ("Use of force is considered an appropriate response where an inmate refuses to obey repeated orders."); *Rios v. McBain*, No. 504-cv-85, 2005 WL 1026192, at *7 (E.D. Tex. Apr. 28,

2005) (explaining that "open defiance of orders plainly poses a threat to security of the institution, regardless of whether or not the defiance is emanating from within a locked cell.")  In this case, a legitimate and important need existed to conduct a limited search of Plaintiff to ensure he did not have items he could use to harm himself or others. The competent summary judgment evidence establishes that Plaintiff's refusal to follow orders warranted the use of force.

The next *Hudson* factor is the relationship between that need and the amount of force used.  The use of force video establishes the amount of force used was administered in a measured way, appropriate to the situation.  Plaintiff's *Spears* hearing testimony in which he characterizes Officer Cavazos "going crazy" with the gas (D.E. 19, p. 11) is not supported by any summary judgment evidence. Lt. Cavazos's deployment of the chemical agent was limited to three short bursts of OC gas with each deployment being preceded with Plaintiff being given opportunities to comply.

The next *Hudson* factor is the threat reasonably perceived by the responsible officers. In this instance, the threat was not immediate or even imminent.  Plaintiff was secured in a locked holding cell.  However, the threat of Plaintiff actively and directly refusing instructions of correctional officers was real.  This is not a situation where correctional officers overestimated the perceived threat and used an amount of force that may have been greater than necessary.  In this instance, Plaintiff's noncompliance was real and the use of force was measured.

The last *Hudson* factor is whether any effort was made to temper the severity of a forceful response. In this instance, the competent summary judgment evidence establishes without contradiction that efforts were made to avoid the use of force. Lt. Cavazos warned Plaintiff of the consequences of not complying with orders. Plaintiff was given multiple opportunities to comply before force was administered. After each of the three deployments of the chemical agent, Plaintiff was given an additional opportunity to comply. Plaintiff was simply openly defiant. He knew a chemical agent was going to be used against him and he still chose not to follow orders.

The majority of the Hudson factors weigh against Plaintiff. Also important to this analysis is whether the force was used in a malicious or sadistic manner. The use of force video shows Lt. Cavazos to have acted with much patience and professionalism. Plaintiff was not subjected to any verbal abuse or verbal aggression. The use of force video makes it clear Lt. Cavazos gave Plaintiff multiple opportunities to comply with orders. When Lt. Cavazos deployed the chemical agent he did so in a limited and restrained manner and then gave Plaintiff additional opportunities to follow instructions. When Plaintiff finally relented, the use of force ended. Accordingly, even when viewing the competent summary judgment evidence in a light most favorable to Plaintiff, no genuine issues of material fact exist as to whether Defendant Cavazos used excessive force maliciously or sadistically against Plaintiff in violation of the Eighth Amendment. *See Adams v. Cantwell*, No. 6:20cv11, 2022 WL 4091967, at *11 (E.D. Tex. Aug. 2, 2022), *rec. adopted* 2022 WL

4082471 (E.D. Tex. Sep. 6, 2022) (recognizing that "[t]he absence of malicious or sadistic action for the purpose of causing harm results in a meritless claim of excessive force.")

Even if Plaintiff could demonstrate an Eighth Amendment violation, Defendant Cavazos would still be entitled to summary judgment as Plaintiff cannot show his actions were objectively unreasonable under clearly established law.  Because Defendant Cavazos has asserted his right to qualified immunity, Plaintiff has the burden to "rebut the defense by establishing that his allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of [Lt. Cavasos's] conduct."  *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 409 (5th Cir. 2008).

As set forth above, based on the competent summary judgment evidence before the Court, no genuine issues of material fact exist concerning whether the use of force in this instance was unreasonable.  The undisputed summary judgment evidence establishes that Lt. Cavazos did not violate a statutory or constitutional right of Plaintiff.  Further, any theoretical right Plaintiff may have had to prevent the deployment of chemical agents under the facts of this case is not clearly established.

The undersigned recommends Lt. Cavazos' Motion for Summary Judgment be **GRANTED** as to Plaintiff's Excessive Force claim because the summary judgment evidence establishes the force was not excessive and Lt. Cavazos is entitled to qualified immunity.

**D.**     **Deliberate Indifference**

**1.**     **General Legal Principles for Deliberate Indifference**

Plaintiff claims Lt. Cavazos, Officer Rangel and Officer Strack acted with deliberate indifference to his serious medical needs when Plaintiff was not decontaminated in a timely manner after the deployment of a chemical agent against him.  Prisoners are protected from cruel and unusual punishment by the Eighth Amendment.  While not mandating a certain level of medical care for prisoners, the Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate medical care.  *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

Prison officials are liable for failure to provide medical treatment if they are deliberately indifferent to a prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97 (1976).  Deliberate indifference may be exhibited by prison doctors in their response to prisoners' needs, but it may also be shown when prison officials have denied an inmate prescribed treatment or have denied him access to medical personnel capable of evaluating the need for treatment.  *Id.* at 104-05.  A prison official acts with deliberate indifference if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 847.  The official must both be aware of facts from which an inference of substantial risk of serious harm can be drawn and also draw the inference.  *Easter*, 467 F.3d at 463.  A prison official's knowledge of substantial risk may be inferred if the risk was obvious.  *Id.*

"Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citation omitted). Delay in treatment may be actionable under § 1983 only if there has been deliberate indifference and the delay results in substantial harm. *Stewart v. Murphy,* 174 F.3d 530, 537 (5th Cir. 1999); *Mendoza v. Lynagh,* 989 F.2d 191,195 (5th Cir. 1993).

Although inadequate medical treatment may rise to the level of a constitutional violation, "unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment, absent exceptional circumstances." *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012). Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. *McCormick v. Stadler*, 105 F.3d 1059, 1061 (5th Cir. 1997) (citations omitted).

### 2.    Analysis – Deliberate Indifference

Plaintiff alleges he was left unattended for two to three hours after the use of force incident. (D.E. 19, pp. 8-9). Plaintiff further alleges he was unconscious and that later he made repeated requests to be seen by the medical department. (D.E. 19, p. 9). As noted above, Plaintiff never lost consciousness during the entirety of the use of force video. (D.E.

47-1).   Plaintiff coughed sporadically and rubbed his eyes, but he was not otherwise showing signs of experiencing a serious medical problem.   The use of video also shows Plaintiff was assessed by a nurse after the last deployment of the chemical agent when Plaintiff had become compliant.  This initial medical assessment was brief.  (D.E. 47-1 at 15:10 – 15:30).   After the initial medical assessment, Plaintiff received remediation instructions.  (D.E. 47-1 at 16:36)  By Plaintiff's own admission, Lt. Strack took Plaintiff to a shower, although Plaintiff testified the shower occurred two or three hours after the use of force.  (D.E. 19, p. 9).

Plaintiff's TDCJ medical records show Plaintiff was seen by a licensed vocational nurse at 6:19 p.m. on June 20, 2021. (D.E. 39-22, p. 137) and again at 6:52 p.m.  (D.E. 39-22, p. 136).  Plaintiff denies he was taken to the medical department after the use of force, but he does not provide any competent summary judgment evidence in support.  (D.E. 44, pp. 4-5, 8).  The medical record dated 06/20/2021 with the 18:52 time reference indicates the medical assessment was "due to chemical agent released – use of force."  (D.E. 39-22, p. 136).  Therefore, because the records refer to the use of force involving OC gas, it is clear this examination occurred after the use of force incident.   The medical records establish Plaintiff received an assessment at 6:19 p.m. which occurred one hour and twenty-four minutes after the end of the use of force video.  During these assessments, medical personnel took Plaintiff's height, weight, BMI, oxygen saturation level, blood pressure, pulse and rate of respiration.  (D.E. 39-22, p. 135). The activity notes indicate Plaintiff was alert, tense, dressed appropriately and oriented to person, place, time and situation.

Plaintiff was also described as withdrawn and having organized thought processes with normal speech and motor activity.  His eye contact was described as poor.  (D.E. 39-22, pp. 139 – 140).  Plaintiff denied any injuries or respiratory difficulty.  (D.E. 39-22, p. 136).  Plaintiff was assessed as having no adverse health effects from the use of force and was released back to security.  (D.E. 39-22, p. 136).  The summary judgment evidence does not establish whether Plaintiff was taken to the shower before or after his medical examinations.

Plaintiff's medical records also indicate Plaintiff was seen by the medical department on June 28, 2021.  Plaintiff was again assessed as having no adverse health effects from the use of force and was released back to security.  (D.E. 39-22, p. 135).  The summary judgment evidence establishes Plaintiff was seen by medical personnel and was taken to a shower to decontaminate.  The question before the Court is whether Plaintiff was subjected to deliberate indifference where there was a delay of approximately an hour and a half for Plaintiff to be taken to the medical department or decontaminated after being subjected to a chemical agent.

In *Clay v. Stacks*, No. 9:04CV72, 2006 WL 688999, at *3 (E.D. Tex. Mar. 15, 2006), the District Court granted summary judgment in favor of the defendants with regard to a prisoner's deliberate indifference claims regarding his lack of decontamination after a use of force incident involving OC spray.  The Court noted:

> The effects of pepper spray generally last from 20 to 90 minutes. *See* http://www.peppersprayinformation.com. No special decontamination protocols are required for OC pepper spray because it is biodegradable, and will not persist on clothing or the affected areas. *See* "Evaluation of Pepper Spray,"

National Institute of Justice Research in Brief, February 1997. The Court notes that in a criminal case, the Third Circuit reversed a district court's determination that use of a pepper spray by a bank robber constitutes "use of a dangerous weapon" because the effects of the spray lasted only 10 to 15 minutes. *United States v. Harris,* 44 F.3d 1206, 1214 (3rd Cir.1995). In addition, the Fifth Circuit has noted that decontamination from pepper spray "consists primarily of flushing the eyes with water." *Wagner v. Bay City, Tex.,* 227 F.3d 316, 319 n. 1 (5th Cir. 2000).

Id. at *17.

In *Amos v. Jefferson*, No. 5:17CV195, 2019 WL 950367, at *9 (E.D. Tex. Feb. 27, 2019), aff'd 861 F.App'x 596 (5th Cir. 2021), the Court also granted summary judgment in favor of defendants in an OC spray case, noting:

Courts have held the normal effects of being sprayed with pepper spray are *de minimis*. *See, e.g., Martinez v. Nueces Cty., Tex.*, 2:13cv178, 2015 WL 65200 (S.D. Tex. Jan. 5, 2005) (simply being pepper sprayed, without some long term effects, is a de minimis injury), aff'd sub nom. *Martinez v. Day*, 639 F. App'x 278 (5th Cir. May 12, 2016) (defendants entitled to summary judgment on plaintiff's claims of excessive force, including tasing and pepper spray, where there was no evidence of cognizable injuries); *Williams v. U.S.*, 4:08cv2350, 2009 WL 3459873 (S.D. Tex. Aug. 12, 2011) (claim of "severe bruising and scrapes upon his body" and "extreme pain from being kicked and sprayed in the eyes with pepper spray" were *de minimis* ); *Oakley v. Weaver*, 162 F.3d 1159, 1998 WL 792669 (5th Cir. Nov. 2, 1998) (use of pepper spray during an arrest was not excessive force).

In *Amos*, the Plaintiff alleged he had suffered lasting damaged to his eyes as a result of the OC spray.  The *Amos* Court refused to accept Plaintiff's conclusory statements which were not supported by any medical evidence.  *Id.* at 10 (citing *Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir. 1995)); *Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (prisoner's self-diagnosis alone will not support a medical conclusion).  *See also Martin v. Live Oak*

*Cty. Jail*, No. 2:22-CV-00156, 2023 WL 2874461, at *22 (S.D. Tex. Jan. 23, 2023), report and recommendation adopted, No. 2:22-CV-00156, 2023 WL 2873382 (S.D. Tex. Apr. 10, 2023), aff'd, No. 23-40254, 2023 WL 7206638 (5th Cir. Nov. 1, 2023) (45-minute to one-hour delay in decontamination did not amount to deliberate indifference); *Grandpre v. Gusman*, No. 17-8935-DEK, 2018 WL 3632364, at *8 (E.D. La. July 31, 2018) (30-minute delay between pepper spray incident and trip to medical unit did not constitute deliberate indifference); *Segura v. Cherno*, No. 6:21-cv-0740-YY, 2022 WL 3587860, at *11 (D. Or. May 25, 2022); *Jacoby v. Baldwin Cnty.*, 596 F. App'x 757, 766-67 (11th Cir. 2014) (eight-hour delay in decontamination from pepper spray did not constitute deliberate indifference).

The undersigned finds Defendants are entitled to qualified immunity as to Plaintiff's deliberate indifference claims. With regard to the first step of the analysis, Plaintiff has failed to establish a constitutional violation. Based on the undisputed summary judgment evidence, the undersigned finds Plaintiff was not subjected deliberate indifference in violation of the Eighth Amendment. The record establishes Plaintiff was seen by medical personnel minutes after the use of force and was subsequently taken to the medical department approximately one and a half hours from the use of force. While the exact timing is unclear, Plaintiff's own testimony is that he was taken to a shower for decontamination.

The second part of the qualified immunity analysis is whether the right which was violated was clearly established. While the Court need not address the second step in this

instance, the undersigned notes the cases cited above indicate that Plaintiff does not have a clearly established right to be decontaminated immediately after the deployment of OC spray against him or even that a delay of an hour to an hour and a half is a violation of a clearly established right.  The purposes of qualified immunity identified by the Supreme Court are "(1) preventing unwarranted timidity in the exercise of official duties; (2) ensuring that highly skilled and qualified candidates are not deterred from public service by the threat of liability; and (3) protecting public employees—and their work—from all of the distraction that litigation entails." *Perniciaro v. Lea*, 901 F.3d 241, 253 (5th Cir. 2018).  Additionally, even if Plaintiff has suffered a more than *de minimis* injury to his eyes, there is no evidence any of the defendants were aware, or should have been aware, that Plaintiff would suffer an adverse reaction to the chemical agent.  Defendants' actions in this case were objectively reasonable in accordance with the law as it existed at the time of their conduct.  *Mouille v. City of Live Oak,* 977 F.2d 924, 928 (5th Cir. 1992).

Therefore, the undersigned recommends Defendants' Motion For Summary Judgment be **GRANTED** as to Plaintiff's deliberate indifference claims because Defendants are entitled to qualified immunity.

## VI.   CONCLUSION

As set forth above, the competent summary judgment evidence establishes that Plaintiff's excessive force and deliberate indifference claims are subject to dismissal because Plaintiff failed to properly exhaust his claims and because Defendants are entitled to qualified immunity. Therefore, it is **RECOMMENDED** that Defendants' Motion for

Summary Judgment (D.E. 38) be **GRANTED**.   The undersigned specifically recommends Plaintiff's excessive force claim against Officer Aaron Cavazos and his deliberate indifference claims against Officer Aaron Cavazos, Officer Romeo Rangel and Officer Sven Strack be **DISMISSED with prejudice.**   If this M&R is adopted it will resolve all of Plaintiff's remaining claims and the Court should enter final judgment against Plaintiff.

ORDERED on April 9, 2024.

Jason B. Libby
United States Magistrate Judge

## <u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).